**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **RICKY SAVAGE**, | **CIVIL ACTION** |
| Plaintiff, |  |
| *v.* | **NO. 19-6026-KSM** |
| **TEMPLE UNIVERSITY – OF THE COMMONWEALTH SYSTEM OF HIGHER EDUCATION,** et al., |  |
| Defendants. |  |

**MEMORANDUM**

**MARSTON, J.**                                                    **March 29, 2022**

Plaintiff Ricky Savage brings this suit against his former employer, Defendant Temple University – of the Commonwealth System of Higher Education ("Temple"), and four Temple supervisors, Defendants Joseph Monahan, Kevin Casey, Brendan Muller, and Felisha Brown (collectively, the "Temple Supervisors").  (Doc. No. 18.)  Savage claims Defendants discriminated and retaliated against him on the basis of his religion and the intersection of his religion and race, in violation of 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act ("PHRA"), and the Philadelphia Fair Practices Ordinance ("PFPO").[1]  He seeks compensatory and punitive damages, declaratory relief, and injunctive relief.  (*Id.*)  At the close of discovery, Defendants filed a partial motion for summary judgment. (Doc. No. 50.)  For the reasons discussed below, that motion is granted in part and denied in part.

---

[1]  The Court previously dismissed Savage's amended complaint to the extent it raised claims of discrimination on the basis of race.  (*See* Doc. No. 23 at ¶ 1.)

## I.   FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Savage, the relevant facts are as follows.

Savage is a Black male and has been a practicing Muslim since 1995.  (P. Ex. E at 19:3–8 ("Savage Depo.").)  He has routinely attended religious services once a week at mosques in Philadelphia, Pennsylvania and Wilmington, Delaware.  (Savage Depo. at 19:12–24:5.)  Although Savage sometimes attends services in Philadelphia, he is a founding member and clergyman at the Masjid Ar-Razzaq Mosque in Wilmington.  (Savage Depo. at 23:20–25:2 (explaining that the mosque was founded in 2001 and as a member of the clergy he teaches lessons throughout the week, often gives the weekly sermon on Fridays, and provides counseling to adults and teenagers).)

### A.   *Savage Accepts a Position at Temple*

In late 2017, Savage applied for an electrical supervisor position with Temple.  (Savage Depo. at 158:20–159:1; *see also* D. Ex. 10 (position description for electrical department supervisor).)  He was interviewed twice in connection with his application — once by Defendant Kevin Casey and two other supervisors and a second time by Casey and Defendant Brendan Muller.  (Savage Depo. at 159:2–160:5.)  During the interviews, the men explained that as the electrical supervisor, Savage would work Monday through Friday from 7:00 a.m. to 3:30 p.m., and he would have responsibility for approximately nine subordinates during his shift.  (*Id.* at 161:3–14.)

On May 22, 2018, Temple offered the position to Savage, and he accepted.  (*Id.* at 167:7–168:1; D. Ex. 12 (Welcome Letter from Temple University Human Resources).)  Savage reported directly to Muller, who was the assistant director of operations and maintenance.  (D. Ex. 4 at 12:13–13:2 ("Casey Depo."); Savage Depo. at 168:10–19.)  Muller reported to Casey,

who was the director of operations and maintenance.  (Casey Depo. at 13:3–10; Savage Depo. at 168:10–19.)  And Casey reported to Defendant Joseph Monahan, who was the associate vice president of facilities and operations.  (Casey Depo. at 13:12–14.)

> **B.**      ***Savage's First Week at Temple (June 4 to June 8)***

Savage began working at Temple on Monday, June 4, 2018.  (*See* D. Ex. 12 at p. 1; Savage Depo. at 172:14–17.)  That Thursday, June 7, Savage told Casey[2] that he would be leaving work early on Friday, June 8 for religious reasons, that he would need to work half days on every Friday after that to attend religious services, and that he would need to take off two days a year to observe religious holidays.  (Savage Depo. at 176:13–178:17, 181:20–182:12; Casey Depo. at 53:7–54:17.)  Casey responded that he would need to speak with Monahan to find out how Temple handles requests for religious accommodations.  (Savage Depo. at 178:18–179:11; *see also* Casey Depo. at 57:6–58:2.)  Casey did not comment or forbid Savage from leaving early on June 8.  (*See* Savage Depo. at 182:13–183:5 ("For June 8th I was never denied permission or didn't hear anything about June 8th.  From what my understanding was, he needed more direction on how to accommodate moving forward.  June 8th wasn't — wasn't really in the discussion.  You know, as far as I understood, and even from his response or lack thereof, is he understood that I would be leaving early on June 8th.  We just needed to figure out how to navigate around the accommodation for future Fridays."); *id.* at 183:6–12, 326:15–327:5; Casey Depo. at 62:19–63:4.)

Later that night, Casey texted Muller about his discussion with Savage, describing

---

[2] Although Muller, not Casey, was Savage's direct supervisor, Savage testified that he "didn't have much interaction with [Muller] the entire first two weeks" and that "Casey and [he] developed a relationship and that [Casey] was [Savage's] go-to guy, and that's who [he] communicated with." (Savage Depo. at 186:9–23.)

Savage's request as a "little bizarre," before explaining:

> [Casey:]  He said there is a religious service that he needs to attend on Friday afternoons from 12 to 2.  Asked if he could come in at 5 and leave.  Said he could come back after the service.  I was a little shocked and said I needed to look into whether or not we could accommodate him.
>
> And I forgot . . . he said it was in WILMINGTON DELAWARE!
>
> Wilmington fucking Delaware!
>
> [Muller:]  Forever?  Or a few times?  I believe that is where he's is [sic] from?
>
> [Casey:]  I didn't even get that far.  I was honestly trying to keep a straight face.
>
> And I was fighting off the urge to ask him why he didn't bring it up sooner . . . like when we made the offer, or maybe when I was telling him about the working hours.
>
> [Muller:]  I guess we should see if the other guy is still interested??
>
> [Casey:]  Ha! I do[n']t know.  I said I needed time to [p]rocess his request.

(P. Ex. F.)

The morning of June 8, Casey followed up with Savage and asked him for more details about his request.  (Savage Depo. at 180:7–23; *see also* P. Ex. G (text messages between Savage and Casey).)  Savage explained again that he needed to "be out of the office on Fridays for the second half of the day for religious accommodation," and he added that he was "a worker" and "here for Temple," and happy to come in other times, stay late, come in early, or do whatever needed to be done to make up for the missed time.  (P. Ex. G; *see also* Savage Depo. at 180:24–181:8; *id*. at 348:21–349:15 (explaining that he would have considered going to a closer Mosque of the same denomination); *id.* at 352:21–353:15 (explaining that he would have been willing to make up the missed hours or to trade shifts); Casey Depo. at 245:4–13 (confirming that Savage offered to come in early, work holidays, and work late to make up the hours missed).)  In

response, Casey asked Savage to "give [him] some time to work on this," and explained that while he was going to be out that day, he would be back in the office on Monday and would "get back to [Savage] ASAP." (P. Ex. G.)  Casey then forwarded this information to Monahan, who told him to "[d]eny the request.  We can't not have him here when his staff is here.  Write him up if he leaves." (P. Ex. H at TEMPE_SAVAGE_00278–79 (June 8, 2018 email exchange between Monahan and Casey); *see also* Casey Depo. at 63:13–22; Monahan Depo. at 32:11–33:2.)

Savage left work between 11:00 a.m. and 12:00 p.m. on June 8.  (Savage Depo. at 183:13–24.)  No one spoke to him that day or at any point the following week about having left early.  (*See id.* at 329:9–330:18, 336:10–14.)  Nevertheless, when Monahan learned that Savage had left early, he asked Muller to review the camera footage to confirm that Savage left work early on June 8.  (*See* Muller Depo. at 86:6–18; Monahan Depo. at 33:3–21; P. Ex. K (text messages from June 15 between Monahan and Muller about checking camera footage).)

### C.    *Savage's Second Week at Temple (June 11 to June 15)*

The next Monday, June 11, Savage asked Casey if he had heard anything back about his request to leave early on Fridays, but Casey said he was still waiting on a response from his supervisor.  (Savage Depo. at 187:3–15.)  When Savage still had not heard back on his request by Wednesday, Savage went to Casey again, reiterating his request and emphasizing that he urgently needed an answer because that Friday, June 15, was the Islamic holiday, Eid al-Fitr, and he had to be off that day to attend religious services.  (*Id.* at 189:6–191:19.)

On Thursday, June 14, Casey called Savage into his office and told him that Monahan had denied Savage's request.  (*Id.* at 193:18–196:10 (explaining that he understood Casey to mean that he would not be allowed to leave early "every Friday moving forward" but that the denial was not specific to the 15th); *id.* at 197:1–5.  *But see* Casey Depo. at 93:8–15 (testifying that he was referring to Savage's request to take off on the 15th).)  In response, Savage handed

5

Casey a binder that he had prepared.  (Savage Depo. at 197:1–24.)  The binder included a six-page letter addressed to Casey that clarified Savage's accommodation request and explained that it was a religious mandate for him to attend the mid-day service on Fridays.  (*See* D. Ex. 17 at TEMPLE_SAVAGE_00217–22; Savage Depo. at 197:1–24, 199:8–201:24.)  Savage also included information about religious accommodations from the Equal Employment Opportunity Commission ("EEOC"), the Pennsylvania Human Relations Commission ("PHRC"), and Temple's own policies and procedures.  (*See* P. Ex. H at TEMPLE_SAVAGE_00220–21; Savage Depo. at 197:1–24, 199:8–201:24.)  At the end of the letter, Savage provided "a few ideas that may or may not work" as accommodations and noted that "[i]f none of these ideas are acceptable, I am willing to make other adjustments to my schedule for some other reasonable accommodations."[3]  (*See* P. Ex. H at TEMPLE_SAVAGE_00283–84.)  Savage read the letter aloud, and he and Casey went through it "word for word in detail."  (Savage Depo. at 199:8–201:24.)

> During this discussion, Casey asked Savage why he had failed to raise his scheduling needs during his initial interviews, and Savage explained that he had been reluctant to discuss them because he believed it was unlawful for an interviewer to "ask questions or have a person sign a document that would . . . disclose some protected . . . class or activity."  (*Id.* at 199:8–201:24.)  Casey then asked to share Savage's letter with his supervisor and commented that

---

[3] Casey never spoke with Savage about attending services closer to Temple or other accommodations.  (Savage Depo. at 204:16–205:3, 205:4–9 ("Q: [D]id [Casey] ever say, you know, is there anything else besides the exact accommodation that you requested that would have been acceptable to you?  A: He never asked that.  No."); *see also id.* at 208:23–209:6, 231:11–232:3 ("Kevin Casey didn't offer any other alternative accommodations to what was being requested.  He deferred everything to his supervisor.  His supervisor didn't offer any alternative accommodations, other than what was being requested.").)  In fact, no one from Temple spoke with Savage about possible alternative accommodations.  (*See id.* at 316:14–19 ("Q: Okay. And after you submitted your religious accommodation request, did anybody reach out to you to have further discussions about how they could accommodate your request?  A: No."); *id.* at 348:21–349:19.)

"after seeing this information, I don't know how he can say no."  (*Id.* at 199:8–201:24; *see also* Casey Depo. at 90:7–12.)  Savage agreed and at the end of the conversation, reiterated that he would need to be out the next day, June 15, for the religious holiday, explaining to Casey that "this Friday is critical."  (Savage Depo. at 210:1–10.)

After the meeting, Casey emailed Monahan a copy of the letter and explained that he had "just met with Rick Savage to discuss his request" and that Savage "mentioned several times in our conversation [that] he is not taking a confrontational posture with this; he is willing to work with us on how he can make up the hours."  (P. Ex. J at TEMPLE_SAVAGE_00357 (email on June 14 from Casey to Monahan).)  Monahan forwarded the letter to Tobias Thompson, a Temple Human Resources ("HR") representative.  (P. Ex. J at TEMPLE_SAVAGE_00358 (email from Monahan to Thompson stating, "Let's chat").)  Thompson responded with his "initial thought," which was that "we can make accommodations but we're not required by law to make accommodations that cause a hardship on your business operations."  (P. Ex. M at TEMPLE_SAVAGE_00367 (June 14 email from Thompson to Monahan).)  Thompson, in turn, sought guidance from HR's Labor and Employment Relations Department — a group of "subject matter experts" — including Defendant Felicia Brown, the employee relations manager.  (*See* Thompson Depo. at 43:1–44:24, 46:13–21; P. Ex. J at TEMPLE_SAVAGE_00358 (June 18 emails between Thompson, Brown, and Karin Sullenberger); Brown Depo. at 9:17–20, 10:5–10.)

In the meantime, Monahan directed Casey to "deny the request for tomorrow again."  (D. Ex. 15 (email from Monahan to Casey on June 14 at 4:04 p.m.); Monahan Depo. at 58:22–59:1 ("Q: . . . You told me that you told [Casey] to deny [Savage's] request to take off June 15th, 2018; is that correct?  A: Yeah, I told him that on the 14th.").)  Casey did so almost immediately.  (*See* D. Ex. 21 (email from Casey to Savage on June 14 at 4:22 p.m., stating that "I have been

advised that the request for tomorrow is denied."); *see also* Savage Depo. at 217:1–218:2.)

Afterward, Savage and Casey spoke on the phone. Casey repeatedly apologized for having to deny Savage's request. Savage responded that he understood the decision and that he would be patient in the hopes that they could figure out a long-term solution. (Savage Depo. at 218:15–219:14.) Savage then asked whether he could use one of his available vacation or personal days to attend the Eid al-Fitr service the next day. (*Id.* at 219:4–14; *see also id.* at 332:3–335:7 (explaining that on June 14, 2018, his employee dashboard showed him having 24 hours of available vacation and personal time).) Casey responded that employees can "use personal time for whatever they needed it for . . . . [T]here's no restrictions." (*Id.* at 219:4–222:7 ("I asked him, I said, do you object to that. He said, I don't object to that, you know, you can use it for whatever you need it for, you know."); *see also id.* at 330:19–332:1; *id.* at 346:7–17 ("Kevin Casey, he granted me permission on the 14th to take the day off on the 15th . . . .").).)

After his conversation with Casey, Savage emailed the office manager, Joann DiCroce-O'Hara, that he would not be in the office on June 15 because he was attending to a personal matter. (P. Ex. Q (June 15 email from DiCroce-O'Hara to facilities supervisors, listing call out employees, including "Ricky Savage – Vacation"); *see also* Muller Depo. at 84:7–85:6; Savage Depo. at 233:4–14; DiCroce-O'Hara Depo. at 46:1–18; D. Ex. 2 ("Employee Manual") (explaining that employees with salary grade levels T26 and above, like Savage, "accrue vacation at the rate of two days per month to a maximum of 20 days per year").)

Savage was absent the entire next day to attend the holiday service. (Savage Depo. at 225:5–8.) When Monahan learned that Savage had taken the day off, he emailed Thompson, stating that "[w]ithout getting his supervisor[']s permission in advance," Savage took "off today due to personal matters. This is unacceptable." (P. Ex. M at TEMPLE_SAVAGE_00365 (June

15 email from Monahan to Thompson).)

#### D.     Savage's Final Week at Temple (June 18 to June 19)

When Savage returned to work on Monday, June 18, his employee dashboard showed that 8 hours had been subtracted from his available personal and vacation time.  (*See* Savage Depo. at 334:5–335:3.)  No one spoke with him about missing work on the 15th.  (*Id.* at 333:20–334:4, 336:15–17.)

Meanwhile, Thompson scheduled a conference call with Monahan and Brown to discuss Savage's absences and accommodation request.  (*See* P. Ex. M at TEMPLE_SAVAGE_00366 (June 18 email from Thompson to Monahan).)  Thompson also asked Monahan for additional information about Savage's request, including the specific number of hours Savage was requesting off on Fridays, whether Savage was asking to attend service on or off campus, whether Temple's dental school, which was close by and had a worship area, had a service that Savage could attend, and the dates of the holidays that Savage was requesting off.  (*Id.*)  Thirty minutes later, Monahan responded that Savage was requesting off "11am-4pm" on Fridays to attend services "[o]ff-campus in Delaware."  (*Id.* (June 18 email from Monahan to Thompson).)  Monahan also said that he had reached out to the dental school and that he would "work on" finding out more about the holidays Savage wanted off.  (*Id.*)  However, Monahan did not confirm his answers with Savage before emailing Thompson.  (*See* Monahan Depo. at 134:9–137:21 (confirming that he never spoke with Savage about his accommodation request).)  And despite his assurances to "work on" the holidays issue, he admits he did "nothing" after responding to Thompson's email.  (*See id.* at 130:5–134:8.)

On Tuesday, June 19, Monahan met with Thompson and Brown to discuss Savage missing work on June 15 and leaving early on June 8, and he asked for guidance on the level of discipline that he could take against Savage.  (*See* Brown Depo. at 89:9–21, 91:10–16; Monahan

Depo. at 11:2–14.)  Brown had discussed the issue with her supervisor, Sharon Boyle, and Boyle recommended finding that Savage failed his probation.[4]  (Brown Depo. at 91:17–20, 115:13–116:3.)  Brown communicated the recommendation to Thompson and Monahan during the meeting and via email, explaining that they were "failing him on probation."  (Brown Depo. at 116:4–10; D. Ex. 18 (June 19, 2018 email from Brown to Thompson); *see also* Monahan Depo. at 10:21–11:1.)  Monahan agreed with this recommendation and told Muller that as Savage's direct supervisor he was to "terminate [Savage] for leaving without permission."  (Muller Depo. at 74:7–15; Monahan Depo. at 10:21–11:1.)

Later that afternoon, Muller met with Savage to tell him that he was fired for taking time off without permission on June 15.  (*See* Savage Depo. at 234:20–22, 235:17–237:20, 337:3–20; *see also* Monahan Depo. at 9:13–10:2 (testifying that the "only reason [Savage] was terminated" was for failing to report to work on June 15).)  Savage told Muller that Casey had given him permission to be out on June 15, and Muller left the room to call Monahan (*see* Muller Depo. at 113:17–114:6; Monahan Depo. at 25:17–26:6), but when Muller returned, he said that the termination "stands" because "he"[5] did not "like the way you went about it" (Savage Depo. at 237:4–238:6).

Although Muller drafted a disciplinary report related to the termination, he never showed that report to Savage.  (D. Ex. 22 ("Disciplinary Report"); Savage Depo. at 336:18–23.)  And Savage did not mention his outstanding accommodation request to Muller during the meeting.  (Savage Depo. at 162:15–24; 355:15–356:1.)

---

[4] All new Temple employees "must complete an introductory or probationary period." (Employee Manual at § 10.7.)  For non-Union employees like Savage, the introductory period lasts "six months and can be extended for up to another six months based on performance."  (*Id.*)

[5] It's unclear if "he" refers to Monahan.

### E.      Temple Investigates Savage's Termination

At the end of the meeting with Muller, Savage asked if he could speak to someone in HR, and Muller gave him Brown's phone number. (*Id.* at 238:13–18.) When Savage called Brown, she told him that she knew about his situation, that the termination stood, and that Casey was "in agreement with the termination." (*Id.* at 238:18–240:4; *see also* Brown Depo. at 60:10–61:19 (describing her call with Savage and explaining that she believed he was terminated for being "failed on probation because he had left campus without permission [on June 8], and also, he had an unauthorized absence [on June 15]").) When Savage mentioned his accommodation letter, however, Brown explained that she had not seen that and asked Savage to forward it to her. (*See* Savage Depo. at 240:19–241:10, 241:24–242:17; Brown Depo. at 61:3–14.)

Savage sent the information to Brown and over the next few days called her several times and sat outside the HR office, waiting for a response. (Savage Depo. at 243:11–244:1, 244:23–245:11.) Eventually Brown called Savage and told him that there was nothing she could do and that he should reach out to Tracey Hamilton with Temple's Employment Opportunity Compliance office ("EOC"), who was investigating Savage's case to determine whether he had been subject to religious discrimination. (Savage Depo. at 244:2–8; Hamilton Depo. at 44:1–18.) When Savage spoke with Hamilton, he explained everything that had occurred and told her that he believed he had been denied a religious accommodation and terminated because of his religion. (*See* Savage Depo. at 247:1–250:18; Hamilton Depo. at 45:6–22 ("Q: Did [Savage] mention in his phone call to you that he felt it was religious discrimination?  A: Yes.").) Hamilton also spoke with Monahan, Casey, Muller, Brown, and DiCroce-O'Hara. (*See generally* P. Ex. N (Hamilton's hand-written notes).)

About a month after Savage was fired, Hamilton emailed him a letter titled, "investigation closing notice." (Savage Depo. at 251:11–252:6.) Hamilton found that Savage

11

had not been subjected to religious discrimination, but management had nonetheless failed to explain the proper procedure for taking vacation and personal time.  (*See* D. Ex. 25 (copy of letter sent to Monahan).)  As such, she recommended that Temple rescind the termination and the parties continue discussing whether there was an appropriate religious accommodation.  (*Id.*)

In early July 2018, Monahan met with Casey and an HR representative about Hamilton's findings.  (Monahan Depo. at 219:2–221:19.)  Monahan testified that he agreed with Hamilton's finding that "there was no wrongdoing on our part, from the top part," but he did not "agree in rescinding [termination of] the position."  (*Id.* at 221:5–19; *see also id.* at 220:9–17.)  No one from facilities ever followed up with Savage, and his position was posted for rehiring.

In August 2018, Savage was hired by Penn Medicine as a multi craft electrician, and his religious needs were accommodated.  (Savage Depo. at 70:7–71:3, 72:9–17, 77:20–79:2.)

## F.  Temple's Anti-Discrimination Policy

Temple has an anti-discrimination policy titled, Policy on Preventing and Addressing Discrimination and Harassment (the "Anti-Discrimination Policy").  (*See* D. Ex. 1; Muller Depo. at 48:8–11.).  That policy is based on federal and state anti-discrimination laws, including Title VII and the PHRA, and it lists "religion" as a protected characteristic or status.  (*See* D. Ex. 1; *see also* Employee Manual at § 11.1 ("Discrimination or harassment in the workplace . . . based on an individual's . . . religion . . . will not be tolerated.").)  Temple's Anti-Discrimination Policy charges "[a]ll members of management, supervisors, and faculty" with "responsib[ility] for successfully completing the university's non-discrimination, anti-harassment, and anti-retaliation training upon initial employment and from time to time thereafter."[6]  (D. Ex. 1 at

---

[6] There is some dispute about how frequently employees attend anti-discrimination training.  (*See* Muller Depo. at 48:22–50:3 (explaining that although he did not receive anti-discrimination training during onboarding, Temple does have mandatory training through online modules, which Muller completed in the last five years); Brown Depo. at 20:13–19 (testifying that she could not recall which

TEMPLE_SAVAGE_00157; *see also* Employee Manual at § 11.1 ("All allegations of discrimination will be promptly investigated . . . ."); D. Ex. 29 ("Brunner Decl.") (describing Temple University's anti-discrimination policy and training processes).)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

## III.    DISCUSSION

Defendants argue that Savage cannot put forth evidence to support his claims for intersectional disparate treatment and retaliation under § 1981; that he cannot support his claims against the Temple Supervisors for aiding and abetting liability under the PHRA and PFPO; and that his requests for declaratory relief, tuition remission, future earnings, and punitive damages are improper.[7]  (*See* Doc. No. 50.)  We address each argument in turn.

---

discrimination, harassment, and/or retaliation trainings she has attended); Casey Depo. at 229:5–12 (testifying that Temple provides harassment and anti-discrimination training as a part of the initial onboarding and that he remembers attending harassment training in 2014 when he joined at Temple).)

[7] Defendants also argue that Savage failed to exhaust administrative remedies for his intersectional discrimination claims under Title VII, the PHRA, and the PFPO; that he failed to state a claim for hostile work environment based on the intersection of race and religion under § 1981; that he cannot show he was subject to a hostile work environment under Title VII; that he cannot assert claims for direct discrimination against the Temple Supervisors under the PHRA and PFPO; and that he lacks

### A.      § 1981 Claims Based on the Intersection of Race and Religion

First, Defendants move to dismiss Savage's intersectional claims for disparate treatment (Count IV) and retaliation (Count VI) under § 1981.  (Doc. No. 50 at pp. 5–6.)  These claims are premised on Savage's argument that Defendants discriminated and retaliated against him because he is a Black Muslim.

This Court recently held that although intersectional discrimination claims are cognizable under Title VII, they are not cognizable under § 1981.[8]  *See McCowan v. City of Philadelphia*, Civil Action No. 19-3326-KSM, 2021 WL 84013, at *20 (E.D. Pa. Jan. 11, 2021) ("[A]lthough Title VII permits claims based on the intersection of protected traits (e.g., race and gender), § 1981 does not."); *cf. Floyd v. PEM Real Estate Grp.*, Civil Action No. 17-451-TFM-N, 2019 WL 641088, at *5 (S.D. Ala. Jan. 9, 2019) (finding § 1981 claim based on the theory that "the racial and sexual discrimination intertwine" failed as a matter of law because "'Section 1981 applies only to racial discrimination, not to discrimination based upon religion, national origin, or sex'" (quoting *Masel v. Indus. Comm'n of Ill.*, 541 F. Supp. 342, 344 (D.D.C. 1982))); *Ellis v. Ohio Mattress Co. Licensing & Components Grp.*, Civil Action No. 07-cv-00479-LTB, 2007

---

standing to assert a claim for injunctive relief.  (*See generally* Doc. No. 50.)  Savage has conceded each of these claims.  (*See generally* Doc. No. 54.)  Therefore, we grant summary judgment in favor of Defendants as to them.

[8] Savage cites five cases in support of his assertion that "[b]oth Title VII and Section 1981 prohibit discrimination not only because of race, but also because of the intersection of race and one or more other protected traits (e.g., race and sex)."  (Doc. No. 54 at p. 5.)  But none of those cases involved claims under § 1981.  *See generally Lam v. Univ. of Hawaii*, 40 F.3d 1551, 1561–62 (9th 1994) (analyzing discrimination claims under Title VII); *Fucci v. Graduate Hosp.*, 969 F. Supp. 310 (E.D. Pa. 1997) (analyzing claims under Title VII, the ADA, and ERISA); *Kost v. Dep't of Pub. Welfare*, Civil Action No. 07–2404, 2011 WL 6301956 (E.D. Pa. Dec. 16, 2011) (analyzing claims for discrimination under Title VII, for procedural due process under § 1983, and for conspiracy); *DiBartolo v. City of Philadelphia*, No. Civ.A. 99–CV–1734, 2000 WL 217746 (E.D. Pa. Feb. 15, 2000) (analyzing claims under §§ 1983 and 1985, Title VII, the Pennsylvania Constitution, and Pennsylvania common law); *Reese v. Source 4 Teachers*, CIVIL ACTION NO. 17-4588, 2018 WL 3752987 (E.D. Pa. Aug. 8, 2018) (analyzing discrimination claim under Title VII).

14

WL 2381537, at *2 (D. Colo. Aug. 17, 2007) (dismissing gender discrimination claims under § 1981 because "the great weight of authority" holds that "§ 1981 only applies to discrimination based on race, and does not apply to discrimination based on gender" and none of the plaintiff's authorities supported her argument that "§ 1981 allows a remedy for gender discrimination claims merely because they are intertwined with, or inseparable from, race discrimination").

This is because § 1981 "on its face, is limited to issues of racial discrimination." *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 98 (3d Cir. 1999); *see also, e.g.*, *King v. Twp. of E. Lampeter*, 17 F. Supp. 2d 394, 431 (E.D. Pa. 1998) (explaining that "§ 1981 does not protect against religious discrimination"); *Davis v. Mothers Work, Inc.*, No. Civ.A. 04-3943, 2005 WL 1863211, at *7 n.14 (E.D. Pa. Aug. 4, 2005) ("To the extent that Davis intends to bring a religious discrimination claim under § 1981, that claim is dismissed because it is well established that § 1981 does not cover religious discrimination."). Because Savage's intersectional discrimination claims are not cognizable under § 1981, we grant summary judgment in favor of Defendants on Counts IV and VI.[9]

### B.      PHRA and PFPO Claims

As for Savage's purely religious discrimination claims, the Temple Supervisors move for

---

[9] In the alternative, we find that even if Savage could bring claims for intersectional discrimination under § 1981, his § 1981 retaliation claim would still fail because he has put forth no evidence that he was retaliated against because he complained about race discrimination or intersectional discrimination. *See Castleberry v. STI Grp.*, 863 F.3d 259, 267 (3d Cir. 2017) ("In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation. In doing so, the plaintiff must have acted under a good faith, reasonable belief that a violation existed." (cleaned up)); *Daniels*, 982 F. Supp. 2d at 484 ("[The plaintiff] lodged no complaint of racism at [the school], official or unofficial, until October 28, 2010, over four months after she had left the school. Daniels therefore has not met her burden of bringing forward any evidence of race-related protective activities for the purposes of establishing a *prima facie* retaliation case against the School District and [her supervisor] for her time at [the school]."); *Davis*, 2005 WL 1863211, at *8 ("[T]o sustain a retaliation claim under § 1981, Davis must come forward with evidence that she was retaliated against for her opposition to racial discrimination.").

summary judgment on Savage's PHRA and PFPO claims for aiding and abetting (Counts IX, XII) and retaliation (Counts VIII, XI).  (Doc. No. 50 at pp. 19–26.)  In his response brief, Savage focuses on his retaliation claims, so we begin with retaliation before turning to aiding and abetting liability.

       1.    **<u>Retaliation</u>**

Savage's retaliation claims are governed by the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Analysis under this framework proceeds in three steps.  *Opsatnik v. Norfolk S. Co.*, 335 F. App'x 220, 222 (3d Cir. 2009).  "First, the plaintiff must establish a prima facie case of discrimination."  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410 (3d Cir. 1999).  To state a prima facie case for retaliation, Savage must show "(1) that he engaged in protected employee activity; (2) suffered an adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) [ ] that there was a causal connection between the employee's protected activity and the employer's adverse action."  *Miller*, 158 F. Supp. 2d at 412; *Abdul-Latif*, 990 F. Supp. 2d at 529.

If the plaintiff meets his burden, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for the adverse employment action.  *Jones*, 198 F.3d at 410–11 (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  "Finally, should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)).  To demonstrate pretext, a plaintiff must point "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either:  (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'"  *Id.* at 412–13

(quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)); *see also Shaner v. Synthes (USA)*, 204 F.3d 494, 501 (3d Cir. 2000) ("The plaintiff cannot simply show that the employee's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

Savage argues that the Temple Supervisors retaliated against him when they fired him for requesting a religious accommodation.[10]  Looking to the first element of a prima facie case, the evidence shows that Savage engaged in protected activity when he repeatedly requested that his schedule accommodate his Friday religious requirements on an ongoing basis and the religious holiday on June 15.  *See Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006) ("With respect to 'protected activity,' the anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')."); *Shellenberger v. Summit Bancorp., Inc.*, 318 F.3d 183, 191 (3d Cir. 2003) ("As the court noted in *Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir.1997), 'it would seem anomalous to think Congress intended no retaliation protection for employees who request a reasonable accommodation unless they also file a formal charge.  This would leave employees unprotected if an employer granted the accommodation and shortly thereafter terminated the employee in retaliation.'").

As to the second element, there is no dispute that Savage was subject to an adverse

---

[10] Savage also argues that Brown and Monahan retaliated against Savage when they denied Savage's accommodation requests.  (*See* Doc. No. 54 at pp. 10, 14.)  But the only protected activity that Savage engaged in was his request for an accommodation.  Therefore, the denial of that request is properly viewed as giving rise to a failure to accommodate claim and not as a claim for retaliation.  *See, e.g.*, *Kaite v. Altoona Student Transp., Inc.*, 296 F. Supp. 3d 736, 740–44 (W.D. Pa. 2017) (analyzing failure to accommodate claim as separate from retaliation claims).  Likewise, Brown and Monahan's individual roles in denying Savage's requested accommodations are properly viewed as claims for aiding and abetting the failure to accommodate, not retaliation.

employment action when he was fired on June 19.  *See Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) (holding that Jewish professor's termination by the governing board was an adverse employment action for purposes of her retaliation claim, as was her supervisor's "recommendation not to retain" her for another year).  Last, there is a causal connection between Savage seeking religious accommodations and his firing on June 19, which occurred twelve days after Savage first requested a long-term religious accommodation and just four days after Savage took a vacation day to attend services on June 15.  *See LeBoon v. Lancaster Jewish Cmty. Ctr.*, 503 F.3d 217, 232 (3d Cir. 2007) ("Where the temporal proximity between the protected activity and the adverse action is unusually suggestive, it is sufficient standing alone to create an inference of causality and defeat summary judgment.").  Indeed, the evidence shows that Savage was fired *because* he took a personal day to attend religious services on June 15.  *See Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 483 (E.D. Pa. 2013) (noting that the court may rely on "direct evidence of a causal connection between the protected activity and adverse action").

Given this evidence, we find that Savage has stated a prima facie case of retaliation.  The burden now shifts to Defendants to demonstrate that they had a legitimate nondiscriminatory reason for firing Savage.  Defendants do not explicitly discuss this requirement in their briefing.  But to the extent they imply that Savage was fired for missing work on June 15 without permission and in contravention to Temple's vacation request policy, there is more than enough evidence to call this justification into question and find pretext.  First, viewing the evidence in the light most favorable to Savage, Casey gave Savage permission to use a vacation day to miss work on June 15.  (*See* Savage Depo. at 219:4–222:7, 330:19–332:1, 346:7–17.)  Second, although Monahan testified that his only reason for firing Savage was that Savage missed work

on June 15, Monahan also testified that he would have fired Savage even if Casey had given him permission to take off that day.  (Monahan Depo. at 166:12–24.)  Last, the decision to terminate Savage without first explaining how to properly request vacation days and without letting him finish the probation period, is at odds with certain portions of Temple's Employee Manual.  (*See* Employee Manual at § 14.2 ("The Human Resources Department encourages departments to work with any new employee to define performance expectations, provide feedback to the employee during the introductory/probationary period and to provide the employee with at least 30 days to meet those expectations . . . prior to recommending the employee's discharge to the Human Resources Department.").)

Focusing on this series of events, the Court finds questions of fact preclude summary judgment on Savage's PHRA and PFPO retaliation claims against Monahan and Brown because there are disputes about whether and to what extent each Defendant recommended and/or decided that Savage be terminated.  (*See* Monahan Depo. at 8:15–9:12 (testifying that the decision to fire Savage was a "collective decision" that involved Monahan, Brown, and Thompson).

The same cannot be said of Muller and Casey.  Savage argues that Muller retaliated against him because Muller was Savage's direct supervisor and "he, alone, effected the termination to plaintiff and prepared the corresponding termination notice."  (Doc. No. 54 at p. 13.)  Savage also argues that "Muller did not oppose Defendant Monahan's decision to . . . terminate Plaintiff" despite believing Savage's assertions that Casey gave him permission to be out on June 15.  (Doc. No. 54 at p. 13–14.)  We are not convinced.  The undisputed facts show that although Muller told Savage that he was being fired, Muller was acting at the explicit direction of Monahan, and there is no evidence that he had the authority to disregard Monahan's

19

orders or to otherwise oppose them.  (*See* Muller Depo. at 85:21–24 (confirming that "all th[e] information" in the discipline report "is based on Mr. Monahan's representations"); *id.* at 113:17–114:6 (testifying that when he called Monahan to explain what Savage had told him during the termination meeting, Monahan responded, "Proceed with the termination"); *id.* at 115:19–24 (testifying that when Monahan told him to "proceed with the termination," Muller felt he had no choice but to "follow the directive"); *see also* Monahan Depo. at 8:15–17 (testifying that he "advised Brendan Muller to terminate Ricky Savage"); *id.* at 10:3–20 (confirming that Muller was not involved in the decision to terminate Savage and that Muller was the one to tell Savage only because it is "customary for the supervisor of the individual to terminate the employee that works for them").)

Likewise, the evidence shows that Casey seriously considered Savage's requests for accommodation and diligently pursued the matter with his superiors and HR.  (*See* Casey Depo. at 57:6–58:2 ("My response to his request was, you know, I need to—I need some time to look into this . . . .  [T]he other thing that I mentioned to him there is that, you know, I tried to impress upon him that I was taking his request very seriously.  I understood, you know, what he was looking to accomplish, and I would get him an answer as quickly as possible."); *see also id.* at 84:3–11; P. Ex. G (text messages between Savage and Casey about request); P. Ex. J at TEMPLE_SAVAGE_00357 (email on June 14 from Casey to Monahan about request).) Although Casey had to repeatedly deny Savage's requests, he, like Muller, did so at the explicit direction of Monahan.  (*See, e.g.*, P. Ex. H at TEMPLE_SAVAGE_00278–79 (June 8, 2018 email from Monahan to Casey, telling Casey to deny Savage's request and "[w]rite him up if he leaves"); D. Ex. 15 (email from Monahan to Casey on June 14 at 4:04 p.m., telling Casey to "deny the request for tomorrow").)

Seeming to acknowledge that Casey was acting on Monahan's orders, Savage argues that Casey retaliated against him by "failing to oppose [Monahan's] actions" and by "defer[ring] to and enforc[ing] Defendant Monahan's decisions." (*See* Doc. No. 54 at pp. 12–13.) But there is no evidence that Casey had the authority to oppose Monahan, who was his direct superior. (Casey Depo. at 13:12–14.) Last, we note that after Casey gave Savage permission to use a vacation day to miss work on June 15, Casey went out on vacation and did not return to work until *after* Monahan, Brown, and Thompson decided to fire Savage. (*See id.* at 167:3–4; *see also* Monahan Depo. at 8:15–9:12 (testifying that the decision to fire Savage was a "collective decision" that involved Monahan, Brown, and Thompson).) Given this evidence, we cannot find that Casey had a deciding role in Savage's firing, and therefore, we must grant summary judgment in his favor on Savage's retaliation claim.

For those reasons, we grant summary judgment in favor of Muller and Casey[11] on Savage's retaliation claims under the PHRA and PFPO. We deny summary judgment as to Monahan and Brown.

## 2. Aiding and Abetting

Savage also brings aiding and abetting claims against the four Temple Supervisors.[12] The PHRA and PFPO prohibit "any person" from:

> aid[ing], abet[ting], incit[ing], or coerc[ing] the doing of any act declared by this section to be an unlawful discriminatory practice, or to obstruct or prevent any person from complying with the

---

[11] We note that both Muller and Casey made questionable comments related to Savage's requests. (*See* P. Ex. F (test messages between Muller and Casey about Savage's request).) But these comments on their own do not create a retaliation claim, and we cannot ignore the undisputed evidence that the decision to fire Savage was made by Muller and Casey's superiors.

[12] Savage discusses aiding and abetting only in connection with Casey. (*See* Doc. No. 54 at pp. 11–13.) But as stated *supra* n.8, Savage appears to conflate his individual retaliation claims with his individual aiding and abetting claims. Therefore, we will broadly consider whether Savage has put forth aiding and abetting claims against any of the individual Defendants.

> provisions of this act or any order issued thereunder, or to attempt, directly or indirectly, to commit any act declared by this section to be unlawful discriminatory practice.

43 Pa. Stat. & Con. Stat. § 955(e); *see also* Phila. Fair Practices Ordinance § 9-1103(1)(h) (making it unlawful for "any person to aid, abet, incite, induce, compel or coerce the doing of any unlawful employment practice . . . ."). To make out a claim for "aiding and abetting against an individual employee, the plaintiff must show that the defendant knew about and either substantially assisted or encouraged the discrimination that the plaintiff experienced. *McCowan v. City of Philadelphia*, Civil Action No. 19-3326-KSM, 2022 WL 742687, at *35 (E.D. Pa. Mar. 10, 2022); *see also Failla v. City of Passaic*, 146 F.3d 149, 157–58 (3d Cir .1998) ("[A]n employee aids and abets a violation of the LAD when he knowingly gives substantial assistance or encouragement to the unlawful conduct of his employer.").

For the reasons discussed in the previous section, we deny summary judgment as against Monahan and Brown because they provided substantial assistance to Temple in terminating Savage.[13] We also deny summary judgment as against Monahan because he provided substantial assistance to Temple by refusing to engage in the interactive process with Savage about his accommodation requests and by flat out denying Savage's requests for accommodation on June 8 and June 15.

---

[13] The Temple Supervisors argue that they were merely following the recommendations of others when it comes to Savage's termination. But it is not as clear cut as they would have the Court find. Notably, there is evidence that Monahan is not bound by recommendations from HR and has in the past refused to terminate a probationary employee despite other's suggestions of termination. (*See* Monahan Depo. at 81:13–24 (testifying that it was his decision to extend the employee's probation period instead of firing him).) Likewise, although Brown spoke with her own supervisor about the best course of action to take, the evidence shows that she was heavily involved in the decision to terminate Savage and that the ultimate decision was hers as well as Monahan's and Thompson's. (*See* Brown Depo. at 89:9–21, 91:10–20, 115:13–116:3–10; D. Ex. 18 (June 19, 2018 email from Brown to Thompson explaining that they were "failing [Savage] on probation"); Monahan Depo. at 8:15–9:12 (testifying that the decision to fire Savage was a "collective decision" that involved Monahan, Brown, and Thompson).)

However, we once again find summary judgment is warranted as to Muller and Casey because there is no evidence that they participated in the decision to fire Savage or had the authority to go against their superiors.  In addition, despite being Savage's direct supervisors and learning that Savage wanted to leave early on Fridays to attend religious services, there is no evidence that Muller or Casey had the authority to act on Savage's accommodation requests once they were elevated well above Muller and Casey's station.  Neither is there any evidence that Muller knew about or took part in denying Savage's requests to leave work early on June 8 or to take the entire day off on June 15.  Because there is no evidence that Muller or Casey assisted, let alone substantially assisted, the discriminatory conduct, judgment is granted in their favor.

* * *

In sum, summary judgment is granted to Muller and Casey on Savage's PHRA and PFPO claims for retaliation and aiding and abetting.  Summary judgment is denied as to the claims against Monahan and Brown.

### C.    *Requested Relief*

Last, Defendants seek summary judgment on Savage's requests for declaratory relief, future damages, and punitive damages.

### 1.    <u>Declaratory Judgment</u>

First, Defendants argue that they are entitled to summary judgment on Savage's request for declaratory judgment because Savage "can only set forth claims under Title VII, the PHRA, and PFPO for discrimination and retaliation," and "those claims provide a clearly defined remedy," which removes any "need for this Court to grant declaratory relief."  (Doc. No. 50 at pp. 27–28.)  Savage responds that under Federal Rule of Civil Procedure 57, declaratory relief may be offered as an alternative to other remedies.  (Doc. No. 54 at pp. 15–16.)

"Declaratory judgments are meant to define the legal rights and obligations of the parties

23

in anticipation of some future conduct." *Andela v. Admin. Office of U.S. Courts*, 569 F. App'x 80, 83 (3d Cir. 2014). They are not "meant to simply proclaim that one party is liable to another." *Id.* Because Savage has conceded to the dismissal of his claim for injunctive relief, and the undisputed evidence shows that he has no intention of returning to Temple, he appears to be seeking nothing more than a declaration that Defendants discriminated against him in the past, and declaratory judgment is not proper. (*See* Doc. No. 18 ¶¶ 187–91.) *See Andela*, 569 F. App'x at 83 (affirming dismissal of request for declaratory relief on Title VI and Title VII claims because "the conduct alleged in the complaint took place in the past").

## 2. **Future Damages**

Next, Defendants argue that Savage's claims "for damages related to lost tuition remission benefits and future earnings are too speculative for a fact finder to determine." (Doc. No. 50 at p. 28.) We begin with Savage's request for front pay before turning to his claim for tuition remission benefits.

### a. *Front Pay*

"Though back pay makes a plaintiff whole from the time of discrimination until trial, a plaintiff's injury may continue thereafter." *Donlin v. Philips Lighting N.A. Corp.*, 581 F.3d 73, 86 (3d Cir. 2009). In discrimination cases, the Third Circuit has explained that "an award of front pay is appropriate where a victim of employment discrimination will experience a loss of future earnings because he or she cannot be placed in the employment position that was unlawfully denied." *Bartek v. Urban Redevel. Auth. of Pittsburgh*, 882 F.2d 739, 747 (3d Cir. 1989); *Donlin*, 581 F.3d at 86 (same). In other words, "[t]he award of future lost earnings in Title VII cases is an alternative to the traditional equitable remedy of reinstatement." *Goss v. Exxon Office of Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984).

"In selecting a cut-off date for an equitable front pay remedy the court exercises its

24

discretion." *Goss*, 747 F.2d at 890. "[T]here will often be uncertainty concerning how long the font-pay period should be, and the evidence adduced at trial will rarely point to a single certain number of weeks, months, or years." *Donlin*, 581 F.3d at 87. "More likely, the evidence will support a range of reasonable front-pay periods," and "[w]ithin this range, the district court should decide which award is most appropriate to make the claimant whole." *Id.* Indeed, a review of Third Circuit opinions suggests that terms of four months may be appropriate in some cases, while a period of eight or even ten years is appropriate in others. *Compare Goss*, 747 F.2d at 890 (affirming trial court's decision to limit front pay award to four months instead of the four and a half years requested by the plaintiff), *with Donlin*, 581 F.3d at 88 ("Accordingly, we find that the District Court did not abuse its discretion when it awarded Donlin front pay for 10 years."); *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 376 (3d Cir. 1987) ("The only remaining variable is that a future damage equation assumes that the plaintiff would have remained with the employer until normal retirement age, absent illegal termination. Since the plaintiffs were all within eight years of normal retirement age when terminated by Witco, this assumption does not require unreasonable speculation. (internal citations omitted)).

For example, in *Donlin*, an advisory jury recommended a front pay award that covered the difference in the plaintiff's "salary and pension earnings for 25 years, adjusted to account for the probability of death and discounted to present value." 581 F.3d at 86. The district court ultimately limited the award to a 10 year period. *Id.* On appeal, the defendant argued that "an award of front pay based on a 10-year period was inappropriate because it involved speculation regarding market conditions, Donlin's future earnings, and her length of employment." *Id.* at 87. The Third Circuit rejected that argument. It noted that "[b]ecause a claimant's work and life expectancy are pertinent factors in calculating front pay, such an award necessarily implicates a

prediction about the future," and the court cannot "refuse to award front pay merely because some prediction is necessary." *Id.* (cleaned up).  Instead, the district court should "exercise discretion in selecting a cut-off date for an equitable front pay remedy subject to the limitation that front pay only be awarded 'for a reasonable future period required for the victim to reestablish her rightful place in the job market.'" *Id.* (quoting *Goss*, 747 F.2d at 889–90).  Given the evidence at trial and the advisory jury's recommendation that front pay be awarded for a period of 25 years, the Third Circuit found that the district court did not abuse its discretion when it gave an award for 10 years.  *Id.*

Defendants argue that we should grant summary judgment in their favor on Savage's claim for front pay because the damages are "highly speculative and require a fact finder to engage in multiple assumptions," including that Savage "would have remained at Temple for the next 10 years" and that he "would not receive any salary increase at his current place of employment through raises or promotions."  (Doc. No. 50 at p. 30.)  Mindful of the cases discussed above, the Court cannot at this time find that front pay damages are too speculative as a matter of law.  Therefore, we deny Defendants' motion as to this issue.  We defer ruling on whether front pay damages are appropriate, and if so, for what period of time and in what amount, until after hearing the evidence presented at trial.[14]

---

[14] Although some level of speculation is inherent in a front pay award, Savage is warned that he must put forth evidence from which we can calculate a reasonable award.  Failure to do so at trial could result in the denial of front pay altogether.  *See McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992) ("We also note that when a party fails to provide the district court with the essential data necessary to calculate a reasonably certain front pay award, the court may deny the front pay request. Such information includes the amount of the proposed award, the length of time the plaintiff expects to work for the defendant, and the applicable discount rate."); *Smith v. Gen. Elec. Co.*, No. CIV. A. 93-5250, 1996 WL 24762, at *7 (E.D. Pa. Jan. 22, 1996) ("Plaintiff presented no evidence of the salary she would have received in such a position, the benefits she would have received or the duration she would have held it; this deprived the jury of the 'essential data necessary to calculate a reasonably certain front pay award.'" (quoting *McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992))).

### b. Tuition Remission

Defendants also seek summary judgment to the extent Savage seeks to recover tuition benefits that would have been available while Savage was employed at Temple.  (*See* Savage Depo. at 297:12–305:18).  As a full-time salaried employee, Savage was eligible for tuition remission if he pursued a graduate degree at Temple.  (*See* Brown Depo. at 54:10–19, 55:9–13; Employee Manual at § 7.9 (describing tuition remission policy).)  His four children could also have taken advantage of the tuition remission policy while Savage remained employed at Temple.  (*See* Brown Depo. at 55:3–7.)

Defendants do not dispute that the tuition remission policy would have covered Savage and his children.  Instead, they argue that even if the five family members qualified for tuition remission, a finding that they would have taken advantage of those benefits is too speculative to support a damages award.  (Doc. No. 50 at p. 29.)  Specifically, Defendants argue that any award would be "predicated on a series of assumptions," including that (1) Savage and his children would apply for a higher education program; (2) they would apply to Temple for their studies; (3) Temple would accept their applications; (4) Savage would remain employed at Temple during the pendency of his studies and their education; (5) Temple would continue to offer tuition remission as an employment benefit; and (6) Savage and his children would not receive other financial aid or scholarships that would impact their tuition benefits.  (Doc. No. 50 at p. 30.)

Some of these arguments are more persuasive than others, but at the end of the day, the Court is compelled to agree with Temple.  Here, the assumptions are too many to stand as the foundation for a damages award.  Most compelling is the lack of any evidence that Savage or his children have applied to *any* college degree programs, let alone applied for and been accepted to a degree program at Temple.  (*See* Savage Depo. at 297:24–302:9 (testifying that he is not

currently attending any graduate courses).) *See Leboon v. Alan McIlvain Co.*, CIVIL ACTION NO. 12-2574, 2014 WL 11430975, at *3 (E.D. Pa. Apr. 4, 2014) ("The amounts requested by Mr. LeBoon for his son and daughter's education are not appropriate damages here because they are speculative. Mr. LeBoon represented that he is unable to co-sign loans on behalf of his children due to his poor credit, but his children, ages 15 and 17, have not yet incurred student loans. Mr. LeBoon's own student loans are also not appropriate compensatory damages in this case."); *Solomon v. Warren*, 540 F.2d 777, 794 (5th Cir. 1976) ("The court did not commit error in its award of $8,000 to the appellee for the pecuniary loss of schooling or formal education by Jeffrey and Lawrence Levin," who attended college after their parents' deaths and had their expenses paid by their parents' estates. However, because their sister, "Ellynn did not attend college and made no further plans to attend college, the award of damages for her loss of schooling at the college level was speculative, and without evidentiary support."); *cf. Herx v. Diocese of Ft. Wayne-S. Bend, Inc.*, Case No. 1:12-CV-122 RLM, 2015 WL 1013783, at *7–8 (N.D. Ind. Mar. 9, 2015) ("Part of Mrs. Herx's compensation for teaching for the Diocese was tuition for her son. Mrs. Herx's son was in kindergarten at the school *when her employment ended*, and she moved her son to a public school. The jury awarded $7,000 for lost tuition benefits, consisting of two-and-a-half years of tuition at $3,000 a year. . . . The record supports a lost benefits award of $7,000 to reflect the loss of the tuition benefit." (emphasis added)).

In short, the damages request is too speculative to the extent it seeks recovery of tuition remission benefits. *See Gunby v. Pa. Elec. Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988) ("Although it is necessary in § 1981 and Title VII cases that compensatory damages be provided, speculative damages will not be awarded."); *see also Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cnty.*, No. 02:06cv1064, 2008 WL 5115043, at *2 (W.D. Pa. Dec. 4, 2008)

28

("[D]amages must be calculated to a degree of reasonable certainty and cannot be speculative, vague or contingent on unknown factors.").  Therefore, we grant summary judgment to Defendants on Savage's damages claim for tuition remission benefits for himself and his four children.

### 3. <u>Punitive Damages</u>

Last, Temple argues that it is entitled to summary judgment on Savage's claim for punitive damages under Title VII because it maintains non-discrimination, anti-harassment, and anti-retaliation policies, and it "provides periodic training to its employees on preventing discrimination and harassment."  (Doc. No. 50 at pp. 30–31.)  Savage responds that Temple "did not engage in good faith efforts to comply with federal law" because although it had a written anti-discrimination policy, it failed to act in compliance with that policy.  (Doc. No. 54 at p. 19.)  Specifically, Defendants Brown and Casey were unable to recall when they last received anti-discrimination training, and Monahan's actions show that he failed to consider in good faith Savage's accommodation request.  (Doc. No. 54 at pp. 19–20.)

Punitive damages are available in a Title VII case where the plaintiff shows that he was subjected to intentional discrimination, *see* 42 U.S.C. § 1981a(a)(1); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999), and that Defendants "engaged in a discriminatory practice or discriminatory practices *with malice or with reckless indifference to the federally protected rights of the aggrieved individual*," *Kolstad*, 527 U.S. at 534 (quoting 42 U.S.C. § 1981a(b)(1)).  "The inquiry does not end with a showing of the requisite 'malice or reckless indifference' on the part of certain individuals, however."  *Id.* at 539.  The plaintiff must also show that liability for punitive damages should be imputed to the employer.  *Id.*  The Supreme Court has held that "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's

29

good-faith efforts to comply with Title VII." *Id.* at 545 (quotation marks omitted).

For example, in *Ridley v. Costco Wholesale Corp.*, the Third Circuit upheld summary judgment in favor of the defendant employer because there was no dispute that it had made a good faith effort to comply with Title VII:

> [T]he undisputed evidence presented by Costco established that Costco maintained policies against discrimination and harassment and an Open Door policy for reporting complaints of discrimination or harassment. The evidence also showed that Costco trained new supervisors with respect to Costco's harassment complaint policy and provided supervisors with detailed materials regarding the supervisor's obligation to address discrimination issues. Costco also trained its warehouse and staff managers with regard to handling complaints of discrimination and instructed managers that such complaints were to be taken seriously. Despite the disputed issues of facts as to whether Vadney and Long's actions were adequate, a reasonable jury could not conclude from this evidence that the company did not make good-faith efforts to comply with Title VII.

217 F. App'x 130, 138 (3d Cir. 2007); *see also Pinckney v. Pep Boys — Manny Moe & Jack*, 340 F. Supp. 3d 454, 463 (E.D. Pa. 2018) ("Defendant maintains a Code of Conduct . . . , requires its employees to complete various customer service trainings, which review Defendant's policies against harassment and discrimination . . . , has a system in place for reporting grievances[,] and . . . encourages directors and managers to report all incidents of discrimination and harassment. In light of Defendant's good-faith efforts to prevent the kind of intolerable racial animus alleged, Defendant may not be held vicariously liable for punitive damages for Mr. Morton's actions."); *cf. EEOC v. Bob Evans Farms, LLC*, 275 F. Supp. 3d 635, 668 (W.D. Pa. 2107) (allowing the issue of the good faith defense to go to the jury because the evidence showed that the defendant "had anti-discrimination policies, required review of the policies by management and by employees . . . , and had open door policies and alternate avenues to raise issue of discrimination," but also that the defendant's general manager discriminated against her

because of her pregnancy, that the defendant's "anti-discrimination policy did not specifically prohibit discrimination based on pregnancy," and that the defendant "did not expressly train its managers on pregnancy discrimination issues nor provide specific anti-discrimination training to [the general manager in question]").

Here, the evidence shows that Temple maintained anti-discrimination, anti-harassment, and anti-retaliation policies that prohibit discrimination on the basis of religion.  (*See* Anti-Discrimination Policy at TEMPLE_SAVAGE_00158 ("The university will not tolerate unlawful discrimination or harassment in the workplace . . . based on [an] individual's . . . religion . . . ."); Employee Manual at § 11.1 ("Discrimination or harassment in the workplace . . . based on an individual's . . . religion . . . will not be tolerated."); *see also* Muller Depo. at 48:8–11.)  Those policies require managers and supervisors to take appropriate action to prevent and address discrimination and harassment in the workplace.  (*See* Anti-Discrimination Policy at TEMPLE_SAVAGE_00158.)  They also encourage all present or former employees who believe they were discriminated against or harassed to file a complaint with Temple's EOC office. (Anti-Discrimination Policy at TEMPLE_SAVAGE_00158.)  There is also evidence that managers and supervisors — including Monahan, Casey, Muller, and Brown — are required to complete "the university's non-discrimination, anti-harassment, and anti-retaliation training upon initial employment and from time to time thereafter."  (Anti-Discrimination Policy at TEMPLE_SAVAGE_00158; *see also* D. Ex. 6 (showing that Monahan completed training on preventing discrimination and harassment on December 7, 2016, that Casey completed it on July 22, 2014, that Muller completed it on June 12, 2014, and that Brown completed it on September 23, 2014).[15])

---

[15] Savage argues that we cannot consider these records because they are hearsay under Federal Rule of Evidence 801 and cannot be authenticated.  (*See* Doc. No. 54-1 at ¶ 4.)  However, Defendants

Nevertheless, we cannot at this stage find these policies and training amount to a good faith effort to comply with Title VII.  First, we note that although Temple has a policy against religious discrimination, multiple supervisors, including numerous employees in HR, decided to fire Savage without ever speaking with him about his accommodation request or his absences to attend religious services.  And even after Temple's investigation concluded that Savage's supervisors should rescind Savage's termination and continue discussions about an appropriate accommodation, Monahan and HR upheld the termination without speaking to Savage.  Second, we find substantial questions about the adequacy of Temple's training program.  Notably, Casey testified that he had not received anti-discrimination training since he was hired in 2014, and Brown—a member of Temple's HR team of *subject matter experts* for *labor and employment relations*—testified that she could not recall the date or scope of her most recent anti-discrimination training.  (Doc. No. 54 at p. 19.)  Finally, Monahan's utter failure to consider Savage's accommodation request or engage in the interactive process suggests a serious gap in Temple's anti-discrimination training.  In addition, although we have dismissed Savage's claims against Casey and Muller, we find it notable that Casey repeatedly took issue with Savage's failure to disclose his accommodation request during his interview, and Muller's initial response to the accommodation request was, "I guess we should see if the other guy is still interested??" Both reactions further call into question the adequacy of Temple's training program.

Given this evidence, we find a genuine dispute of material fact about whether Temple engaged in good faith efforts to comply with Title VII.  Therefore, we withhold ruling on

---

submitted the Declaration of Eric Brunner, Temple's Assistant Vice President in HR Learning & Development, which authenticates the records and shows that they fall within the business records exception to the Rule against hearsay.  (*See* Brunner Decl. at ¶ 5 (explaining that "[r]ecords of each employee's compliance with Temple University's training is recorded in the University's Banner system" and Defendants' Ex. 6 are the "Banner training records" for Monahan, Casey, Muller, and Brown).)  *See* Fed. R. Evid. 803(6).

whether a punitive damages instruction is warranted until after we hear the evidence adduced at trial.

## IV.   CONCLUSION

For the reasons discussed above, we grant summary judgment in favor of Defendants on: (1) Savage's claims for intersectional discrimination, (2) Savage's claims under § 1981, and (3) hostile work environment under Title VII.  We also grant summary judgment in favor of Muller and Casey on Savage's PHRA and PFPO claims, and in favor of Monahan and Brown only on Savage's direct discrimination claims under the PHRA and PFPO.  Last, we find that Savage cannot recover declaratory judgment, injunctive relief, or tuition remission.  The remainder of Defendants' partial motion for summary judgment is denied.

An appropriate order follows.